## Herald Publishing Co. v. The National Circulation Co.

(Decided May 25, 1911.)

Appeal from Jefferson Circuit Court
(Chancery Branch, Second Division).

1.  Contract by the Herald Publishing Co., Owning and Publishing
    the Louisville Herald, with the National Circulation Co., a Cor-
    poration Promoting Schemes for Increasing the Circulation of
    Newspapers—Held: That the contract as written expressed the
    real intention of the parties, for while in its letters and pam-
    phlets, appellee stated what its usual guarantee was, it also stated
    that it would give any kind of guarantee wanted by appellant.
    With this information before it the appellant, represented in the
    execution of the contract by business men of capacity and ex-
    perience, we must conclude that the guarantee embodied in the
    contract while not in terms the usual guarantee given, was such
    as was entirely satisfactory to it.
2.  Guarantee—The guarantee as provided in the contract was,
    that the money taken in on new subscriptions and classified ad-
    vertising, would equal the cost of prizes and the sum paid for
    commissions. In the absence of this guarantee under the con-
    tract appellee would have been entitled to $1,613.86, as commis-
    sions, but because of the guarantee the chancellor scaled its
    commission to $1,229.72, so that its commissions and the cost
    of prizes exactly equaled the total receipts from new subscrip-
    tions and classified advertising. This finding is correct accord-
    ing to both the letter and spirit of the contract.

FLEXNER, CAMPBELL & GORDON for appellant.

GREENE & TILFORD for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

The Herald Publishing Company, owning and pub-
lishing the Louisville Herald, a daily newspaper in the
city of Louisville, entered into the following contract
with the National Circulation Company, a corporation
engaged in promoting schemes for increasing the cir-
culation of newspapers:

"This agreement made and entered into this 28th
day of August, 1909, by and between The Louisville Her-
ald of Louisville, Kentucky, as publishers of The Louis-
ville Morning Herald and the Weekly Herald hereinafter
known as the party of the first part and the National

Circulation Company of Columbus, Ohio, hereinafter known as the party of the second part for the purpose of increasing the circulation of the above-mentioned papers by means of a Voting Contest:

"Witnesseth: That the party of the first part hereby agree to furnish the necessary space in the above-mentioned publications to chronicle the events of the contest and to analyze the developments of each day's balloting: To furnish a supply of receipt blanks and voting certificates adapted to the needs of the contest; to furnish all necessary printing and advertising matter; to furnish stamps for letters and circulars sent to candidates and their friends; to furnish all necessary transportation for Contest Manager to look after the interest of the Contest; to furnish coupon books good for classified advertising and to furnish the prizes of the Contest.

"Party of the second part hereby agrees to furnish the contest plan; to assume complete charge of the contest; to furnish five Contest Managers and local assistants to aid them; to furnish stenographers; to furnish their Bulletin System; aid contestants as may be necessary; supervise the counting of the ballots; furnish necessary copy for properly exploiting the Contest and furthermore guarantees that the amount of money taken in on new subscriptions and classified advertising will equal the cost of the prizes and the amount to be paid them as commissions.

"Contest to begin September 5, 1909, and to close eight weeks later.

"In consideration of the foregoing it is hereby agreed and provided that the proceeds of the Contest shall be divided as follows: On all new subscriptions—meaning subscriptions not on the list of the above-mentioned publications at the time of the beginning of the Contest, and any subsequent payments made by new subscribers during the life of the Contest, 70 per cent. to party of the first part and 30 per cent to party of the second part. On all Coupons for Classified Advertising, 70 per cent. to party of the first part and 30 per cent. to party of the second part. On all old subscriptions and back collections, 90 per cent. to party of the first part and 10 per cent. to the party of the second part. Settlements to be made on demand of the party of the second part after

enough money has been taken in on new subscriptions and Classified Advertising to cover the cost of the prizes.

(Signed)    "THE LOUISVILLE HERALD,
        "By CHAS. STUART, Cir. Mgr.
    "Party of the first part.
        "THE NATIONAL CIRCULATION Co.,
        "Per Jos. N. BORDERS,
                "General Manager.
    "Party of the second part.

"Approved by:

    "THE NATIONAL CIRCULATION Co.,
        "Per Jos. B. BORDERS,
                "General Manager."

The Contest provided for in this contract was held, and, according to the figures submitted by the Herald, it received,from new subscriptions $4,969.70, and from classified advertising $77, making a total from these two sources of $5,046.70; from back collections $998.60. On these amounts the Circulation Company claim commissions, as follows: On the new subscriptions and classified advertising $1,514, and on back collections $99.86, a total of $1,613.86. The Herald expended for prizes $3,-816.98, inasmuch as the amount expended for . prizes and the commissions claimed by the Circulation. Company exceeded the total amount of receipts for new business and classified advertising, The Herald refused to pay commissions, such refusal resulting in this litigation. The Herald contended that, under the contract, the circulation Company was entitled to no commission whatever, whereas, the said company claimed that it was entitled to commissions as per its contract, amounting in the aggregate to $1.613.86, and it instituted its suit for this amount. The Herald, in its answer, relied upon its construction of the contract, and also pleaded that, in the drafting of the contract, it was understood between the parties that unless the total receipts from new business and classified advertising exceeded the premiums and commissions no commissions were to be paid; that they intended to so draw the contract as to effectuate this understanding; that if it was not susceptible of this construction it asked that it be reformed so as to carry out the real intent of the parties. The plaintiff relied upon the contract as made, and alleged that there was no fraud or misrepresentation in its execution. The trial in the

circuit court resulted in a judgment in favor of plaintiff for $1,229.72, to reverse which The Herald appeals.

Three grounds are relied upon: First, that it was entitled to have the contract reformed; second, that the contract was obtained by fraudulent representations as to the capacity and experience of its contest managers, by reason of which the contest was a failure; and third, that even under the contract, as written, the appellee is entitled to no commission.

As to the first proposition, it is insisted that it was the intention of both parties that the guarantee clause in the contract should be that which appellee usually gave, and that by mutual mistake the usual guarantee was not embodied in the contract; and it is of this that appellant especially complains. It appears that, prior to the execution of the contract, there had been some correspondence between the parties relative to the contest and the character and nature of the guarantee which the appellee proposed to give. In one of their letters, dated about three weeks before the contract was entered into, they wrote appellant as follows:

"Our terms are reasonable, we guarantee you that the new business that we bring you will be greater than the cost of the prizes and our commissions, and we can furnish you with as much experienced help as is necessary to make your contest a success."

And again, in a circular pamphlet sent or delivered to appellant, the following language is used:

"Our usual guarantee reads as follows: 'That the payments from new subscribers shall be more than cost of the prizes and our commissions.' We do not ask for commissions until this guarantee is made good by us. We can and will give you any kind of a guarantee that you desire. Write us the form that you want it to take."

And in another pamphlet, entitled "Do the Common Thing in the Uncommon Way," is the following language:

"If you want a guarantee of what our proposition will do for you, all you have to do is to ask for it. We can and will make you any kind of a guarantee you want. We have confidence in our plan and in ourselves. Write and tell us what you want a contest to do for you and what kind of a guarantee you want us to give you. We

do not flood you with literature about what we have done —we'll guarantee you what we will do.

"Did you ever have a contest man offer you a guarantee? Put this proposition up to any of them and you'll think you're in an undertaker's establishment on a busy day. Try it!"

It is urged for appellant that, by reason of these communications, it was led to and did believe that a guarantee in accord with these representations would be set out in the contract, and that inasmuch as appellee represented that this was its usual guarantee, it likewise contemplated that such would be embodied in the contract. Appellee contends that the guarantee as embodied in the contract is in reality the guarantee which it offered to give. The construction placed by appellant's counsel upon the statements in the letter and pamphlets, as to the character of guarantees which they would give, is highly technical, for under it, if the cost of prizes and commissions should exceed the total receipts from new business and classified advertising by one dollar, or any sum whatever, appellee would be entitled to no compensation; whereas, if the cost of prizes and commissions fell short of such receipts, appellee would be entitled to full commission. Such is not the reasonable or fair construction or interpretation of the language used. The evident intent, aim and understanding of the parties was that the cost of prizes and commissions should in no event exceed the total amount received from new business and classified advertising. This is the construction which the chancellor placed upon the contract, and is in reality what the proposed guarantee meant.

Aside from this we must conclude that the contract as written expressed the real intention of the parties, for while in its letters and pamphlets the appellee stated what its usual guarantee was, it also stated that it would give any kind of character of guarantee wanted by appellant. With this information before it the appellant represented in the execution of the contract by business men of capacity and experience, we must conclude that the guarantee embodied in the contract, while not in terms the usual guarantee given, was such as was entirely satisfactory to it. Our conclusion in this particular is very much strengthened by another clause in the contract, by which it is provided that settlements are to be made on the demand of the party of the second part, that

is, the appellee, after enough money has been taken in on new subscriptions and classified advertising to cover the cost of prizes. This shows clearly that appellee was entitled to compensation as soon as the receipts from the named sources exceeded the cost of the prizes. If the construction of the contract contended for by appellant is correct, then no settlement could be had until the contest had been closed and it had been definitely ascertained whether or not the receipts from these two sources exceeded the cost of prizes and commissions, and the addition of this clause in the contract would have been entirely useless. On the other hand, if that construction adopted by the chancellor is given the contract this clause becomes operative, and under it the appellee was enabled to draw on his commissions as soon as the receipts exceeded the cost of the prizes. We are of opinion that the guarantee embodied in the contract was such as the parties intended it should be.

In the second proposition there is little of merit. The proof shows that, of the five men who had charge of this contest, the names of four were submitted in advance, and the selection of the fifth was left to appellee, and its selection was apparently acceptable to appellant. No ground of complaint is afforded because these men were paid commissions rather than salaries. In fact, if their compensation was made dependent upon the result of their labor, it seems that the inducement to render valuable and good service would be stronger than if they were paid a weekly salary. They were competent men, capable of conducting the business, and the proof does not bear out the charge that they were lacking in experience or ability. The result of the contest was not satisfactory to either party. Appellant's business was not extended as much as it was evidently expected it would be, and appellee's profits, by way of commissions, were correspondingly reduced. Under the proof, however, this failure of the contest to measure up to the expectations of the parties can not be attributed to lack of effort on the part of the solicitors. For, in his letter of October 15, when it was apparent that the contest was not going to be as successful as the parties anticipated, Mr. Brown, the manager of The Herald, wrote to Mr. Borders, the manager of the appellee company, "I think the boys are pushing things (referring to the solicitors), and Mr.

Stewart tells me the situation looks a little more encouraging.'' Again, on November 2d, after Mr. Borders had reduced the districts from twenty to eight, thereby eliminating twelve Mediterranean prize trips, Mr. Brown wrote, ''I certainly appreciate your masterly handling of the situation. I know that you will have maintained the same high standard of honesty and aggressiveness.'' In neither of these letters was there any complaint that the solicitors were not doing their full duty, although, when each was written, it was known that the contest was not proving as successful as it was anticipated it would be. The reducing of the prizes by the appellee company from twenty to eight was, according to the testimony of Mr. Brown, a saving to the appellant of something like $6,000. It is quite evident that, when these letters were written, the management of the Herald was not complaining of the character of services which the solicitors were rendering or of the efforts which they were putting forth to make the contest a success. Whether its failure was due to the plan, to the character of the prizes, or to other causes, it is impossible to say, and the fact that Mr. Borders, the manager of the appellee company, after the contest had closed, stated that he was willing that the entire blame should be placed upon him, does not satisfactorily or at all account for the failure, for the reason that all the evidence shows that he did everything that he could to make it a success.

The third ground relied upon for reversal is practically disposed of in the first. The guarantee, as provided in the contract, was that the money taken in on new subscriptions and classified advertising would equal the cost of prizes and the amount paid as commissions. In the absence of this guarantee, under the contract appellee would have been entitled to $1,613.86 as commissions, but, because of the guarantee, the chancellor scaled its commissions to $1,229.72, so that its commissions and the cost of prizes exactly equaled the total receipts from new subscriptions and classified advertising. This finding is correct according to both the letter and the spirit of the contract.

Perceiving no error in the judgment of the lower court, it is affirmed.